UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                     Case No. 20-20245

v.

                                     HON. MARK A. GOLDSMITH

JOSEPH GREGORY DUMOUCHELLE,

        Defendant.

_____/

**OPINION & ORDER**
**REGARDING THE AMOUNT OF LOSS AND RESTITUTION**

        Defendant Joseph DuMouchelle is charged with committing wire fraud, in violation of 18 U.S.C. § 1343. Information (Dkt. 1). DuMouchelle pleaded guilty, see Rule 11 Plea Agreement (Dkt. 14), and he is to be sentenced on July 28, 2022. The amount of loss is relevant for purposes of calculating the sentencing guidelines and bears on restitution, as well. The plea agreement states the Government's position that the amount of loss in this case is within the range of $25 million to $65 million. Id. at 4. However, the parties agreed that DuMouchelle could argue that the amount of loss is within the range of $9.5 million and $25 million. Id. at 4–5. DuMouchelle did challenge the amount of loss and restitution, as well.

        On June 22, 2022, the Court held a hearing to determine the amount of loss and restitution. The Court gave the parties an opportunity to submit post-hearing briefing on these issues, and the parties filed sentencing memoranda setting forth their respective positions. Gov't Mem. (Dkt. 81); Def. Mem. (Dkt. 94).

        As explained below, the Court determines that the amount of loss is $25,308,216 and the amount of restitution is $25,206,401.

## I. BACKGROUND

Prior to his arrest in this case, DuMouchelle was involved in the fine jewelry business. He cheated investors and consignors out of a staggering sum of money and jewelry. The parties disputed whether this sum exceeds or falls short of $25 million.

At the June 22 hearing, the Government and DuMouchelle agreed that the loss amount totals $20,304,884 for the following first set of victims: J.R., M.H., T.G., T.R., Galaxy USA, S.R., E.C., P.Y., and W.R. Gov't Mem. at 16; Def. Mem. at 2.[1,2] Although DuMouchelle initially disputed the losses attributed to M.M., L.D., A.H., D.K., K.C., Y.F., and C.S.,[3] he has now abandoned these challenges in his sentencing memorandum. See Def. Mem. at 2.[4] The total loss amount for this second set of victims is $140,757, bringing the total non-disputed loss amount to $20,445,641.

The parties dispute the loss amount for the following victims: Precious Stones Company (Precious Stones), J.B., East Continental Gems, H.V., A-Ron Resources (A-Ron), LaLonde

---

[1] The Court refers to individual victims by initials to protect their identities. Because there are two individuals with the initials "L.B.," the Court refers to the first as "L.B. 1" and the second as "L.B. 2."

[2] The individual loss amount attributed to each of these victims is as follows: J.R. ($4,500,000), M.H. ($900,000), T.G. ($1,800,000), T.R. ($12,000,000), Galaxy USA ($1,019,840), S.R. ($1,500), E.C. ($15,044), P.Y. ($13,500), and W.R. ($55,000). This totals $20,304,884. However, the Government's sentencing memorandum erroneously concludes that the total loss and restitution amount for these victims is $20,249,939. Gov't Mem. at 16.

[3] Whereas the Government and DuMouchelle agree that the loss of C.S. is $5,000, the presentence investigation report (PSR) (Dkt. 98) attributes a loss of $6,230 to C.S. The Court uses the figure agreed to by the parties.

[4] The individual loss amount attributed to each of these victims is as follows: M.M. ($14,637), L.D. ($42,162.50), A.H. ($45,500), D.K. ($10,457.50), K.C. ($6,000), Y.F. ($17,000), and C.S. ($5,000).

Jewelers (LaLonde), L.B. 1, and G.A. and L.B. 2.  Gov't Mem. at 16.[5]  DuMouchelle asserts that

the loss for this third set of victims is $2,923,160.  Def. Mem. at 2.  Meanwhile, the Government

asks the Court to find that the total loss for this second set of victims is $5,161,200.  See Gov't

Mem. at 16.

As a result, the Government contends that DuMouchelle is responsible for a total loss of

$25,606,841.  Gov't Mem. at 16.[6]  DuMouchelle maintains that the loss amount is $23,368,801.

Def. Mem. at 3.

As for restitution, the Government concedes that two of the victims have recovered a

collective total of $101,815.  Id. at 17.  Deducting this amount from the Government's loss figure

of $25,606,841 results in restitution of $25,505,026.  Id.[7]  DuMouchelle does not explicitly state a

position on the total restitution.

---

[5] DuMouchelle's sentencing memorandum references another set of victims (the "Noble victims"), and asserts that the Government sought to attribute $1,949,039 in loss to these victims.  See Def. Mem. at 2.  This is incorrect.  The Government neither presented proofs regarding losses suffered by these victims nor included these victims in its post-hearing briefing on the amount of loss and restitution.  And at the June 22 hearing, the Government's witness testified that the loss attributed to the Noble victims were not used in calculating the loss caused by DuMouchelle.  Hr'g Trans. at 17 (Dkt. 73).  Accordingly, the Court does not consider the Noble victims in calculating the loss or restitution.

[6] The Government miscalculates the total loss attributable to the victims for whom DuMouchelle does not contest the amount of loss.  As a result, the Government misstates its position on the overall amount of loss as $25,551,896.  Gov't Mem. at 16.  Based on the loss it attributed to each victim, it is evident that the Government intended to state the total amount of loss as $25,606,841.  This summation error does not affect the Government's position on the calculation of DuMouchelle's offense level, as any amount exceeding $25 million warrants a 22-level increase in the defendant's offense level.  U.S.S.G. § 2B1.1(b)(1)(L).  However, because the Government calculates the total restitution by subtracting the recovered amounts from the overall loss amount, the Government's summation error led it to misstate its position on the total restitution owed.

[7] Due to the Government's miscalculation described above, it erroneously states that its position on the amount of restitution as $25,450,081.  Gov't Mem. at 17.

FBI Special Agent Christine Taylor, the lead agent in this case, testified at the June 22 hearing regarding the disputed amount of loss. Agent Taylor based her testimony on information obtained from DuMouchelle's proffer sessions as well as other sources, which are described in further detail below.

## II. ANALYSIS

### A. Amount of Loss

Section 2B1.1 applies to offenses such as wire fraud. See U.S.S.G. § 2B1.1. This section states that a defendant's offense level should be increased by 20 levels if the amount of loss exceeds $9.5 million, and by 22 levels if the amount of loss exceeds $25 million. Id. § 2B1.1(b)(1)(K)–(L). Typically, "[t]he government bears the burden of proving the applicability of the offense level enhancement under Section 2B1.1 . . . by a preponderance of the evidence." United States v. Freund, No. 03-20004, 2008 WL 4601802, at *7 (E.D. Mich. Oct. 14, 2008) (citing United States v. Finkley, 324 F.3d 401, 403 (6th Cir. 2003)).[8] Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," U.S.S.G. § 2B1.1(b)(1), cmt. 3(C), a district court's findings regarding the amount of loss "are not to be overturned unless they are clearly erroneous." United States v. Triana, 468 F.3d 308, 321 (6th Cir.

---

[8] Per his plea agreement, DuMouchelle agreed that the calculation of Guidelines range of 121–151 months' imprisonment is based on the Government's loss calculation of $25 million to $65 million. Rule 11 Plea Agreement at 4. However, under the plea agreement, DuMouchelle "can argue that the loss is within the sentencing guideline loss range of between $9,500,000 and $25,000,000." Id. at 5. The plea agreement does not clearly shift the burden of proving the amount of loss to DuMouchelle. Because the Government should be held "to a greater degree of responsibility than the defendant for any imprecision in a plea agreement, so that ambiguities are construed against the Government," United States v. White, 628 F. App'x 848, 851 (4th Cir. 2015) (punctuation modified), the burden remains with the Government. In any case, the question of who bears the burden of proving evidence by a preponderance "only matters in narrow class of cases where proof is in equipoise." United States v. Davis, No. 4:18-cr-35, 2021 WL 5025105, at *3 (E.D. Tenn. Sept. 17, 2021) (punctuation modified). This is not such a case.

2006).  To show clear error, a defendant must show the calculation "was not only inexact but outside the universe of acceptable computations."  United States v. Martinez, 588 F.3d 301, 326 (6th Cir. 2009).

"The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he fair market value of the property unlawfully taken."  U.S.S.G. § 2B1.1(b)(1), cmt. 3(C)(i).  Ultimately, "[t]he court need only make a reasonable estimate of the loss," meaning that the estimate need not be determined with precision.  Id. § 2B1.1(b)(1), cmt. 3(C); see also Triana, 468 F.3d at 320.

DuMouchelle points out that the United States Court of Appeals for the Sixth Circuit "'has observed [that] fair market value is the price a willing buyer would pay a willing seller at the time of the crime.'"  Def. Mem. at 5 (quoting United States v. Simpson, 538 F.3d 459, 463 (2008)); see also United States v. Goldman, 953 F.3d 1213, 1223 (11th Cir. 2020) (defining "fair market value" as "'[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect'") (quoting Value, Black's Law Dictionary (11th ed. 2019)).  However, DuMouchelle asserts that what the "particular seller/victim would agree to accept" (what DuMouchelle refers to as the "reserve value") should be used to determine the amount of loss.  Def. Mem. at 5.  In other words, DuMouchelle claims that any minimum sale prices that victims conveyed to DuMouchelle would be acceptable for consigned items should govern the loss calculation.  But the lowest price a seller would theoretically be willing to accept for an item before going into the market is not necessarily "the point at which supply and demand intersect."  Value, Black's Law Dictionary (11th ed. 2019).  The Court, therefore, will use the reserve amount only if better approximations of fair market value—such as appraisals or agreements stating the value of the jewelry at issue—are unavailable.

With this framework in mind, the Court assesses the evidence regarding the amount of loss attributable to each of the victims for whom the parties disputed the amount of loss.

### i. Victim Precious Stones

Precious Stones consigned several jewelry items to DuMouchelle to sell, the profits of which Precious Stones and DuMouchelle agreed to split. Precious Stones never received any profits for these items, nor did it ever receive the items back from DuMouchelle.

Agent Taylor testified that $421,600 in loss is attributable to Precious Stones. Hr'g Trans. at 46. This calculation is supported by a memorandum dated July 7, 2020 and authored by Precious Stones reflecting that it consigned items worth $301,600 in November 2016, and an item worth $120,000 in July 2019. Gov't Ex. 23. Further, the Government submitted a document dated July 26, 2018 and signed by DuMouchelle's wife Melinda Adducci—who had significant involvement in DuMouchelle's jewelry business—listing the items consigned by Precious Stones and stating the value of these items as $404,600. Gov't Ex. 24. Agent Taylor explained that $404,600 represents the reserve amount of the items—i.e., the minimum amount that a consigning client will accept for sale of the item—not the actual value of the items. Hr'g Trans. at 48. The Government asserts that the actual value—not the reserve amount—should be used. Gov't Mem. at 10. However, as Agent Taylor testified, even if $404,600 is attributed to Precious Stones—rather than $421,600—the total amount of loss in this case still exceeds $25 million. Hr'g Trans. at 48. Agent Taylor further suggested that $421,600 is a more appropriate figure in light of the fact that the document signed by Adducci mentions an additional $100,000 deposit from Precious Stones to DuMouchelle, which was not included in the Government's calculation of loss attributed to Precious Stones. Id. at 49.

DuMouchelle asserts that the loss attributable to Precious Stones is $250,000. Def. Mem. at 6. In support of his position, DuMouchelle points to emails sent from Benjamin Zucker of Precious Stones to DuMouchelle. Def. Ex. B. In the email sent on February 4, 2019, Zucker recounts various sales that DuMouchelle said had gone through but the deposits from the sales had not been made. Id. Specifically, Zucker recounts two sales where the "net" for Precious Stone was $80,000 and $100,000, respectively. Id. Zucker asks DuMouchelle to send the total $180,000 to a third party to whom Zucker apparently owed a debt. Id. Zucker also recounts that DuMouchelle had said that he had received an offer for two rings that Zucker had consigned, and that Zucker had instructed DuMouchelle not to accept less than $70,000 for the two rings. Id. Zucker asked DuMouchelle to confirm that he agreed to the terms outlined in the email. DuMouchelle apparently did not do so, prompting Zucker to send another email on February 5, 2019 asking once again for DuMouchelle to confirm the terms.

The Court concludes that the Government has proven by a preponderance that the loss attributable to Precious Stones is $421,600. DuMouchelle's evidence does not undercut this conclusion, as the emails are not compelling evidence of the value of jewelry that Precious Stones lost. Significantly, the fact that Zucker's "net" for the two sales of jewelry was $180,000 means that the overall sale price of the jewelry was greater than $180,000, as DuMouchelle and Precious Stones had agreed to split the sale price. This is confirmed by the July 2018 document signed by Adducci, which reflects, for instance, that the sold jewelry that resulted in a $80,000 net to Precious Stones had a higher value of $120,000. Def. Ex. 24. Further, the emails submitted by DuMouchelle—sent in February 2019—predate the July 2020 memorandum that reflects a post-February 2019 consignment of jewelry worth $120,000. The full value of Precious Stones' loss, therefore, is not reflected in the February 2019 emails.

7

### ii.  Victim J.B.

J.B. entered into an agreement with DuMouchelle under which J.B. would give money to DuMouchelle to purchase items at estates sales, DuMouchelle would resell the items, and the profits would be split between J.B. and DuMouchelle.  J.B. gave DuMouchelle a large sum of money, but it was never repaid in full.

Agent Taylor attributed a loss of $2,789,785 to J.B.  Hr'g Trans. at 20.  This conclusion was supported by, among other things, the FBI's interview of J.B., Gov't Ex. 8; a police report filed by J.B.'s business, Gov't Ex. 9; a judgment entered by a New York state court in a civil lawsuit brought by J.B.'s business against DuMouchelle, Gov't Ex. 10; a letter regarding a settlement reached in the lawsuit, Gov't Ex. 11; and Agent Taylor's own review of bank records. By signing the letter, DuMouchelle agreed that he owed $3,279,785 to J.B.'s business.  Gov't Ex. 11.  Agent Taylor testified that, after reviewing relevant bank records, she discovered $500,000 in payments that DuMouchelle made to J.B. earlier in their relationship.  "Even though most of those payments were made before the fraud scheme began, Agent Taylor gave Dumouchelle credit for them," resulting in the Government's final calculation of J.B.'s loss as $2,789,785.  Gov't Mem. at 6 n.2.

DuMouchelle asserts that the loss attributable to J.B. is $2,111,785—which is $678,000 less than the Government's estimate—because "there is a deposited check in the amount of $678,000 that should be credited against the loss amount advanced by the Government."  Def. Mem. at 7 (citing Def. Ex. M).  During the June 22 hearing, defense counsel cross examined Agent Taylor as to her knowledge of a $678,000 payment made by DuMouchelle to J.B. in February 2019.  See Hr'g Trans at 103.  Agent Taylor did not know whether J.B. had received this payment. Id.  The Government represents that, following the June 22 hearing, it confirmed that "the

$678,000 check was dated in February 2019," but "in March and July 2019, after the check was negotiated, both Dumouchelle and [J.B.] . . . agreed that Dumouchelle owed $3,279,785." Gov't Mem. at 7; see also Gov't Ex. 11.  And on October 24, 2019, DuMouchelle and Adducci signed under oath and filed in their bankruptcy case a document listing their 20 largest creditors (the "bankruptcy document").  See Gov't Ex. 38.  This bankruptcy document lists J.B. as one of their largest creditors, with an outstanding debt of $3,403,214.54, and the document reflects that the claim is not disputed.  Id. at 4.[9]  Accordingly, the Government maintains—and the Court is satisfied—that the $678,000 payment should not be deducted from the amount of loss attributable to J.B.

The Court, therefore, finds that the Government proved by a preponderance that the loss attributable to J.B. is $2,789,785.

### iii.  Victim East Continental Gems

East Continental Gems gave DuMouchelle a ring to sell for it.  When East Continental Gems did not receive payment for the ring, it asked for the ring back, but DuMouchelle never returned it.

Agent Taylor attributed $810,000 in loss to East Continental Gems.  Hr'g Trans. at 30. This conclusion was supported by, among other things, the FBI's interview of the owner of East Continental Gems, Gov't Ex. 14; a police report, Gov't Ex. 15; a civil complaint filed by East Continental Gems against DuMouchelle in the United States District Court for the Eastern District of New York, Gov't Ex. 16; and a default judgment entered in the civil action, Gov't Ex. 17.  The police report includes a memorandum reflecting East Continental Gems and DuMouchelle's

---

[9] The document contains boxes to indicate whether a claim is "contingent," "unliquidated," "disputed," or "none of the above apply."  DuMouchelle and Adducci checked the "none of the above apply" box for the $3,403,214.54 claim.  Gov't Ex. 38 at 4.

agreement that the ring was worth $810,000.  Gov't Ex. 15 at 9.  The judgment entered in the civil action, which ordered DuMouchelle to return the ring to East Continental Gems, likewise states the ring's value as $810,000.  Gov't Ex. 17 at 2.  Further, DuMouchelle and Adducci listed East Continental Gems in the bankruptcy document with an outstanding debt of $810,000.  Gov't Ex. 38.

DuMouchelle contends that East Continental Gems did not suffer any loss.  Def. Mem. at 2.  He suggests that the sole measurement of the $810,000 value came from East Continental Gem's owner sworn testimony in the civil action.  Id. at 7.  In other words, DuMouchelle asserts that the $810,000 was a unilateral, unsubstantiated estimation of the fair market value of the ring. Not so.  As noted above, DuMouchelle and Adducci listed East Continental Gems in the bankruptcy document with an outstanding debt of $810,000, and they indicated that this claim was not disputed.  Gov't Ex. 38 at 3.  This evinces DuMouchelle's assent to the $810,000 estimate of the ring's value.

Accordingly, the Court finds that the Government's evidence proves by a preponderance that the loss attributable to East Continental Gems is $810,000.

### iv.  Victim H.V.

H.V. and DuMouchelle entered into an agreement for DuMouchelle to sell a ring that H.V. owned.  After H.V. died, his estate reached out to DuMouchelle about the ring.  DuMouchelle told the estate that the ring had sold, but he never sent any profits of the purported sale to H.V.'s estate. DuMouchelle also never returned the ring to the estate.

Agent Taylor attributed $191,000 in loss to H.V.  Hr'g Trans. at 36.  This conclusion was supported by, among other things, a police report, Gov't Ex. 18; a bailment agreement signed by H.V. and DuMouchelle, Gov't Ex. 19; an activity log for H.V.'s estate, Gov't Ex. 20; and an

appraisal for the ring, Gov't Ex. 21. The police report, bailment agreement, and appraisal all list the ring's worth as $191,500. During the June 22 hearing, the Court questioned Agent Taylor about why the Government was attributing only $191,000—not $191,500. Hr'g Trans. at 132.[10] Agent Taylor did not know the reason. Id.

DuMouchelle attributes a loss of $100,000 to H.V., because this is the lowest price for which H.V. was theoretically willing to sell the ring. Def. Mem. at 9 (referencing Gov't Ex. 20 at 4 (reflecting H.V.'s instruction to DuMouchelle that "[i]f [DuMouchelle] . . . cannot sell the entire ring for 100k he is to return the ring on his next visit")). As stated above, the reserve amount is used to estimate the fair market value only where no better evidence exists. In H.V.'s case, both a bailment agreement and appraisal listed the ring's worth as $191,500. The Court, therefore, declines to use the reserve amount in calculating the loss attributable to H.V.

The evidence establishes by a preponderance that the value of the ring is $191,500. But because the Government seeks to hold DuMouchelle responsible for only a loss of $191,000, the Court determines that the loss attributable to H.V. is $191,000.

### v. Victim A-Ron

A-Ron had a business relationship with DuMouchelle pursuant to which A-Ron would give money to DuMouchelle to purchase jewelry that would then be sold, and DuMouchelle and A-Ron would split the profits. The Government requested loss information from A-Ron, on which basis the Government provided a spreadsheet documenting A-Ron's losses. See Gov't Ex. 22. Agent Taylor testified that, based on this spreadsheet, the Government initially attributed $2,450,000 to A-Ron. Hr'g Trans. at 43.[11] After discussions with DuMouchelle's counsel about this loss

---

[10] The PSR attributes a loss of $191,500 to H.V.

[11] On cross-examination, the defense suggested that the $2,4500,000 loss figure derived from a civil complaint filed by A-Ron against DuMouchelle in a California state court. Def. Ex. F.

amount, the Government decided to give DuMouchelle "every benefit of the doubt" and hold DuMouchelle accountable only for $643,000 attributable to A-Ron,[12] which represents "the amount outstanding and owed to A-Ron during the scheme to defraud" minus the "profits Dumouchelle promised A-Ron."  Gov't Mem. at 9; see also Hr'g Trans at 43–45.

DuMouchelle asserts that the loss attributable to A-Ron is $454,375.[13]  Def. Mem. at 2.  He states that "[t]he issue of A-RON's loss is one of credibility": "[t]he Government did not call any witnesses associated with A-RON or provide the Court with an affidavit.  Instead, a portion of a spreadsheet (essentially a list of items) was submitted."  Id. at 9 (referencing Gov't Ex. 22).  Further, "[c]ountering the item spreadsheet . . . is the civil complaint filed by A-RON in California against Mr. DuMouchelle," which was "filed subject to California's Code of Civil Procedure's rules on truthful pleading" and "identifies the loss as being only $454,375."  Id. (citing Def. Ex. F ¶¶ 21, 32, 36).

As DuMouchelle points out, A-Ron's spreadsheet and civil complaint provide conflicting measurements of its loss.  Because the civil complaint, unlike the spreadsheet, is subject to truthful pleading requirements, the Court determines that the civil complaint provided a more trustworthy estimation of the loss.  The Court, therefore, concludes that the loss attributable to A-Ron is $454,375.[14]

---

[12] The PSR likewise attributes a loss of $643,000 to A-Ron.

[13] DuMouchelle misstates the Government's position as to the loss attributable to A-Ron as $818,000.  Def. Mem. at 2.  Although the Government at one point sought to hold DuMouchelle responsible for this amount, at the June 22 hearing, it clarified that it had altered its position and sought to attribute a loss of only $643,000 to A-Ron.  Hr'g Trans. at 43–45.

[14] Even though the Court does not adopt the Government's estimation of the loss attributable to A-Ron, the Court still finds that the total amount of loss exceeds $25 million.

### vi. Victim LaLonde

LaLonde entered into an agreement with DuMouchelle for DuMouchelle to sell a series of diamonds valued at $95,815.  Hr'g Trans. at 50.  DuMouchelle sold the diamonds but initially did not pay LaLonde in accordance with their agreement.  Id.  This prompted LaLonde to file a police report on October 11, 2018, see Def. Ex. O (Dkt. 94-3), which in turn prompted DuMouchelle to pay LaLonde on October 12, 2018, see Def. Ex. P (Dkt. 94-4); Hr'g Trans. at 50–51.  As a result, the Government attributed a loss of $95,815 to LaLonde, but because LaLonde has already received this sum, the Government contends that the amount should not be included in restitution. Gov't Mem. at 11.

DuMouchelle argues that "the Government is correct that the payment was made after the police report was made," but "the fact that it occurred one day later (and without any evidence that Mr. DuMouchelle was aware of the report or was contacted the police), it is equally (if not more) plausible that the delay in repaying in this instance was caused by business issues (not fraud)." Def. Mem. at 6.  He concludes that there is no loss attributable to LaLonde.

The Court finds DuMouchelle's argument unpersuasive.  The police report reflects that LaLonde's owner told police that over the course of multiple weeks, "[DuMouchelle] told [the owner] . . . that some of the diamonds were sold, but [DuMouchelle] . . . kept making excuses as to why [the owner] . . . wasn't receiving payment and appeared to be stalling."  Def. Ex. O at 3. "At some point while on rapnet.com ([w]ebsite used by diamond dealers to buy/sell diamonds), [the owner] . . . noticed that his 2.94 carat cushion cut diamond was listed for sale by Solomon Cohen Diamond Co. out of New York City . . . ."  Id. at 3–4.  The police spoke with Solomon Cohen, "who state[d] he received the diamond from David Tennenbaum."  Id. at 4.  The police then spoke to Tennenbaum, "who state[d] he bought two diamonds from Joseph Dumouchelle,"

and told the police that he had sales slips that confirmed the transactions.  Id.  This evidence demonstrates that DuMouchelle's delay in paying LaLonde was, in fact, the product of a fraudulent scheme.

The Court determines that the Government established by a preponderance that the loss attributable to LaLonde is $95,815.

### vii.  Victim L.B. 1

L.B. 1 consigned items of jewelry to DuMouchelle, but L.B. 1 was never paid for these items.  L.B. 1 also never received the items back from DuMouchelle.

Agent Taylor attributed a loss of $100,000 to L.B. 1.  Hr'g Trans. at 80.  This calculation is supported by a complaint filed by L.B. 1 with the New York attorney general, which asserts that the jewelry was appraised over $100,00.  Gov't Ex. 35.  The complaint further states that two of the items were auctioned off; DuMouchelle wrote an insufficient funds check for $7,125 for these two items.  Id. at 2.

DuMouchelle claims that the loss attributable to L.B. 1 is $7,000, representing the approximate amount of the check DuMouchelle wrote.  Def. Mem. at 10.  According to DuMouchelle, because L.B. 1 "accepted the check without protest and attempted to cash it, this seems to be clear evidence that $7000 was acceptable as the value of the item at issue."  Id.  In other words, DuMouchelle attempts to argue that $7,000 was the reserve amount that should be used to calculate the loss attributable to L.B. 1.  The Court finds several fatal issues with this argument.  First, it is unreasonable to assume that L.B. 1's attempt to cash the $7,125 check is tantamount to an agreement to accept this amount as sale price for the jewelry.  The more reasonable interpretation is that L.B. 1 attempted to cash this check to try to recover some of the money that he was owed.  Second, as the Court stated above, the reserve amount is an appropriate

estimation of the fair market value only in the absence of better approximations.  In L.B. 1's case, there is a complaint filed with the New York attorney general stating that the jewelry was appraised over $100,000.  Gov't Ex. 35.  L.B. 1 verified in that complaint his understanding that "[a]ny false statement made in this complaint are punishable as crimes," thereby enhancing the trustworthiness of his statements in the complaint.  Id.

For these reasons, the Court concludes that the Government proved by a preponderance that the loss attributable to L.B. 1 was $100,000.

### viii.  Victims G.A. and L.B. 2

G.A.[15] and L.B. 2 consigned jewelry items to DuMouchelle that were owned by their clients.  DuMouchelle promised to wire transfer $110,000 of the $125,750 he owed to G.A. and L.B. 2.  However, he never did so.

Agent Taylor attributed a loss of $110,000 to G.A. and L.B. 2.  Hr'g Trans. at 82–83; 123–124.[16]  This calculation is supported by email communications between G.A. and L.B. 2 and DuMouchelle.  Gov't Ex. 36.  In an email sent from L.B. 2 to DuMouchelle on October 26, 2018, L.B. 2 reiterates DuMouchelle's promise to pay $110,000, states that this wire transfer was never received, and asks DuMouchelle to either wire the full amount of $125,750 or return the jewelry items.  Id. at 1.

DuMouchelle argues that no loss is attributable to G.A. and L.B. 2.  Def. Mem. at 11.  He asserts that although the email referenced a past due invoice, this invoice was not introduced into

---

[15] The Government initially attributed a loss of $30,000 to G.A. and a loss of $110,000 to G.A. and L.B. 2.  Upon realizing that the two G.A.s were likely the same person, see Hr'g Trans. at 123–124, the Government decided to seek to hold DuMouchelle accountable for only the $110,000 loss, see Gov't Mem. at 16.

[16] The PSR likewise attributes a loss of $110,000 to G.A. and L.B. 2.

evidence, and, therefore, the amount of the past due invoice was not corroborated.  Id.  He also argues that "the email does not suggest any fraudulent conduct or misrepresentation."  Id.

The Court agrees with DuMouchelle.  It is tempting to infer fraud in G.A. and L.B. 2's case based solely on DuMouchelle's repeated pattern of failing to pay other victims.  But the emails alone do not prove fraudulent conduct by a preponderance.  Further, as DuMouchelle points out, the emails contain unilateral assertions of the value of the jewelry that are neither corroborated by additional evidence nor made under penalty of criminal punishment or subject to truthful pleading requirements.

As a result, the Court does not attribute any loss to G.A. and L.B. 2.[17]

### ix.  Conclusion Regarding Amount of Loss

As stated above, the parties agree that the loss in this case totals, at a minimum, $20,445,641.  The Court is satisfied that the Government proved by a preponderance of evidence an additional loss amount of $4,862,575, thereby establishing a total loss amount of $25,308,216.  Because this loss amount exceeds $25 million, the Court will increase DuMouchelle's offense level by 22 levels.  U.S.S.G. § 2B1.1(b)(1)(L).

### B.  Restitution

For any offense committed by fraud, a court must order the defendant to make restitution to the victim of the offense in the full amount of the victim's loss.  18 U.S.C. §§ 3663A(a)(1), 3663A(c), 3664(f)(1)(A).  Restitution shall be equal to the greater of (i) the value of the property on the date of the damage, loss, or destruction or (ii) the value of the property on the date of sentencing, minus the value (as of the date it is returned) of any part of the property that is returned.

---

[17] Even though the Court does not adopt the Government's estimation of the loss attributable to G.A. and L.B. 2, the Court still finds that the total amount of loss exceeds $25 million.

18 U.S.C. § 3663A(b)(1)(B).  "Unlike the loss calculation under U.S.S.G. § 2B1.1, which can be based on intended loss, the restitution calculation can only be based on actual loss." United States v. Healy, 553 F. App'x 560, 567 (6th Cir. 2014).  The Government has the burden of establishing the amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e).

As stated above, the Government established by a preponderance that the total loss amount is $25,308,216.  However, as the Government concedes, $101,815 of this amount has been returned to the victims; specifically, LaLonde received payment of $95,815, and K.C. received his ring, which is valued at $6,000.  Accordingly, the Court concludes that restitution is $25,206,401.

### III. CONCLUSION

For the foregoing reasons, the Court determines the amount of loss to be $25,308,216 and, as a result, 22 levels will added to DuMouchelle's offense level.  The Court further determines the amount of restitution to be $25,206,401.  The amount of restitution owed to each victim is as follows:

- Precious Stones Company: $421,600
- J.R.: $4,500,000
- M.H.: $900,000
- T.G.: $1,800,000
- L.D.: $42,162.50
- J.B.: $2,789,785
- A.H.: $45,500
- E.C.: $15,044
- T.R.: $12,000,000
- Galaxy U.S.A.: $1,019,840
- East Continental Gems: $810,000
- D.K.: $10,457.50
- M.M.: $14,637
- Y.F.: $17,000
- C.S.: $5,000
- P.Y.: $13,500
- H.V.: $191,000

- A-Ron Resources: $454,375
- W.R.: $55,000
- S.R.: $1,500
- L.B. 1: $100,000

The probation officer is directed to correct the PSR based on the Court's findings.

SO ORDERED.

Dated:  July 27, 2022                          s/Mark A. Goldsmith
    Detroit, Michigan                          MARK A. GOLDSMITH
                                     United States District Judge