UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

      Case No. 20-20245

      HON. MARK A. GOLDSMITH

JOSEPH GREGORY DUMOUCHELLE,

      Defendant.
_____/

**OPINION & ORDER**
**REGARDING APPLICATION OF THE SOPHISTICATED MEANS ENHANCEMENT**

Defendant Joseph DuMouchelle is charged with committing wire fraud, in violation of 18 U.S.C. § 1343. Information (Dkt. 1). DuMouchelle pleaded guilty, see Rule 11 Plea Agreement (Dkt. 14), and is to be sentenced on July 28, 2022. The Government asks the Court to apply the sophisticated means sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C), to add two levels to DuMouchelle's offense level. Gov't Resp. (Dkt. 71). The Probation Department likewise supports application of the enhancement. Revised Presentence Investigation Report (PSR) at ¶¶ 52, 71 (Dkt. 98). DuMouchelle opposes application of this enhancement. Def. Mem. (Dkt. 69).[1] For the reasons set forth below, the Court concludes that the enhancement should be applied in calculating DuMouchelle's sentence.

---

[1] The parties agreed that no hearing was needed to resolve whether the sophisticated means enhancement is applicable. Accordingly, the Court resolved the issue based on the parties' briefing.

## I. BACKGROUND

Prior to his arrest in this case, DuMouchelle was involved in the fine jewelry business. The Government alleges that DuMouchelle portrayed as legitimate various jewelry transactions that were, in fact, fraudulent. Gov't Resp. at 5.

DuMouchelle pleaded guilty to committing wire fraud in connection with one of these transactions. That transaction arose because DuMouchelle owed money to a victim, T.R. Rule 11 Plea Agreement at 2; Gov't Resp. at 5.[2] As a purported means to repay his debt, DuMouchelle proposed the following transaction: T.R. would purchase a diamond, the "Yellow Rose," for $12 million; DuMouchelle would resell the Yellow Rose for a profit; and DuMouchelle and T.R. would split the profits. Rule 11 Plea Agreement at 2–3. T.R. agreed to the arrangement, but said that he would only send the money directly to the seller—i.e., he would not send the money to DuMouchelle. Id. at 3.

DuMouchelle sent an email to T.R. that contained "what appeared to be an email forwarded from an employee . . . of [the purported seller,] Gemworld International, Inc." PSR at ¶ 16.[3] The forwarded email "provided wire instructions to [a] FineMark Bank and Trust [account] . . .," and directed T.R. to wire $12 million to this account. Id.; Rule 11 Plea Agreement at 3. This bank account actually belonged to DuMouchelle and his wife, Melinda Adducci. PSR ¶ 16; Rule 11 Plea Agreement at 3.[4] Based on the representations and instructions in the email forwarded by

---

[2] The Court refers to victims by their initials to protect their identities.

[3] The Court cites to the PSR for a more detailed description of the transaction involving T.R. But even looking at just the factual allegations that DuMouchelle agreed to in his Rule 11 plea agreement, the Court would still apply the sophisticated means enhancement.

[4] DuMouchelle objects to the PSR's statement that the FineMark Bank account belonged to him and his wife; rather, he states, the account belonged to his business, Joseph DuMouchelle Fine & Estate Jewelers, LLC. Addendum to PSR at A-2–A-3 (Dkt. 98). Whether the account belonged

DuMouchelle, T.R. initiated the wire transfer, which was subsequently declined by FineMark Bank. PSR ¶ 17. DuMouchelle told T.R. that "the wire transfer was denied by FineMark Bank because the dollar amount was too large." Id.[5]

DuMouchelle then sent T.R. another email that contained "what appeared to be an email purportedly from a Gemworld International employee . . . with new wire instructions for [a] Bank of America account . . . ." Id. ¶ 18. T.R. paid the $12 million via wire transfer. Id. ¶ 19.

A few days later, DuMouchelle sent T.R. another email. Id. This email purported to attach the receipt for the sale of the Yellow Rose. Id. The receipt attached to the email reflected the Yellow Rose had sold for $12 million. Id. This receipt was fake; DuMouchelle made it to convince T.R. that he had purchased the Yellow Rose. Rule 11 Plea Agreement at 4.

A couple of months later, DuMouchelle sent T.R. another email, this time attaching what DuMouchelle purported to be a copy of the contract for the purchase and sale of the Yellow Rose. PSR ¶ 21. The attached contract purported to show that the Yellow Rose was sold to an individual residing in Bloomfield Hills, Michigan, for $16.5 million. Id. In reality, the Yellow Rose was never sold; DuMouchelle pocketed the $12 million from T.R. and used the majority of this money to pay his personal and business debts and expenses. Rule 11 Plea Agreement at 4.[6]

---

to DuMouchelle or his business, the result remains the same: DuMouchelle took steps to make it falsely appear that the account belonged to the seller of the Yellow Rose.

[5] DuMouchelle objects to the PSR's statement that the wire transfer was rejected as too large. Addendum to PSR at A-3. Regardless of the reason for the wire transfer being denied, the ultimate point is unchanged: DuMouchelle used a falsified email to get T.R. to transfer $12 million to a bank account that belonged to DuMouchelle or his business, and when this did not work, DuMouchelle used another falsified email to get T.R. to wire the funds to another bank account held by DuMouchelle.

[6] DuMouchelle objects to the PSR's statement that he used the money to pay his "personal debts and expenses," stating that he used the funds for business loans. Addendum to PSR at A-8. Whether DuMouchelle used the funds for personal and business expenses or just his business expenses does not matter; either way, DuMouchelle used the funds for his own purposes.

In addition to this scheme in which DuMouchelle admitted his involvement, the Government contends that DuMouchelle participated in multiple other fraudulent transactions.[7] As examples, it points to transactions involving T.G. and J.R. Gov't Resp. at 6–7. DuMouchelle and T.G. entered into a contract in which they agreed that they would each invest $1.8 million to be used to purchase jewelry, DuMouchelle would auction off the jewelry, and DuMouchelle and T.G. would split the profits. Id. at 6. T.G. wired $1.8 million to DuMouchelle, which DuMouchelle used to pay his personal and business expenses rather than to purchase and auction off the jewelry. Id. However, DuMouchelle told T.G. that he used the money to purchase the jewelry and was preparing the jewelry for auction. Id. at 7. After a few months passed, DuMouchelle told T.G. that the jewelry had sold and that DuMouchelle was just waiting for the sale to close. Id. DuMouchelle also sent T.G. a screenshot of DuMouchelle's bank account showing what he falsely purported to be the funds of the sale. Id.

As for J.R., DuMouchelle solicited and received from him a loan of $4.5 million. Id. DuMouchelle falsely told J.R. that the loan would be secured by DuMouchelle's home and that his home was unencumbered. Id. DuMouchelle has not repaid the $4.5 million to J.R. Id.

## II. ANALYSIS

Section 2B1.1 applies to offenses such as wire fraud. See U.S.S.G. § 2B1.1. It states that a defendant's offense level should be increased by two levels "[i]f . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct

---

[7] DuMouchelle points out that, other than the transaction involving T.R., "[t]he Rule 11 does not include any factual admissions or agreement to any other specific criminal activity." Def. Mem. at 2. At the same time, DuMouchelle does not directly challenge the accuracy of the Government's factual allegations regarding T.G. and J.R. Even if the Court were to only consider the transaction involving T.R., application of the sophisticated means would still be warranted. As explained below, DuMouchelle used sophisticated means like fake emails and fake receipts to execute and conceal the fraudulent transaction involving T.R.

constituting sophisticated means." Id. § 2B1.1(b)(10)(C). Typically, "[t]he government bears the burden of proving the applicability of the offense level enhancement under Section 2B1.1 . . . by a preponderance of the evidence." United States v. Freund, No. 03-20004, 2008 WL 4601802, at *7 (E.D. Mich. Oct. 14, 2008) (citing United States v. Finkley, 324 F.3d 401, 403 (6th Cir. 2003)).[8]

The sophisticated means enhancement is appropriate if the offense conduct was "more intricate than that of the garden-variety offense." United States v. Sethi, 702 F.3d 1076, 1079 (8th Cir. 2013) (punctuation modified); see also United States v. Benchick, 725 F. App'x. 361, 369 (6th Cir. 2018) (rejecting the defendant's argument that "his offenses were no more sophisticated than those in any bank or wire fraud scheme" and explaining that the enhancement was warranted because the defendant "used corporate entities in furtherance of his criminal activities") (punctuation modified); U.S.S.G. § 2B1.1(b)(10), cmt. 9(B) (defining "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense"). The commentary to § 2B1.1(b)(10) provides a list of examples of conduct that ordinarily constitutes sophisticated means, including "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts."

---

[8] DuMouchelle states that "the Rule 11 and the plea colloquy raise a question as to whether Mr. DuMouchelle was accepting the burden of disproving the government's guideline calculations." Def. Mem. at 3. DuMouchelle is referring to the fact that in his plea agreement, he agreed to the Government's recommended Guidelines range of 121–151 months' imprisonment, which incorporates the sophisticated means sentencing enhancement. See Rule 11 Plea Agreement at 5; Worksheet A to Plea Agreement (Dkt. 14). However, the plea agreement does not clearly shift the burden of proving the applicability of the sophisticated means enhancement to DuMouchelle. Because the Government should be held "to a greater degree of responsibility than the defendant for any imprecision in a plea agreement, so that ambiguities are construed against the Government," United States v. White, 628 F. App'x 848, 851 (4th Cir. 2015) (punctuation modified), the burden remains with the Government. In any case, the question of who bears the burden of proving evidence by a preponderance "only matters in narrow class of cases where proof is in equipoise." United States v. Davis, No. 4:18-cr-35, 2021 WL 5025105, at *3 (E.D. Tenn. Sept. 17, 2021) (punctuation modified). This is not such a case.

U.S.S.G. § 2B1.1(b)(10), cmt. 9(B). The fact that a single step in a scheme, in isolation, is non-complex, is not dispositive; the relevant inquiry is whether the conduct, taken as a whole, constitutes sophisticated means. See United States v. Tandon, 111 F.3d 482, 491 (6th Cir. 1997).

DuMouchelle argues that "the government cannot prove any fictious entities, shells or accounts." Def. Mem. at 5. The Court rejects DuMouchelle's position that the enhancement is inapplicable to offense conduct that is not listed in the commentary to § 2B1.1(b)(10). The commentary's list of examples of sophisticated means conduct is "not exhaustive." United States v. Redman, 887 F.3d 789, 792 (7th Cir. 2018). In fact, § 2B1.1(b)(10)(C) and its commentary "reflect[] that a wide range of criminal conduct," i.e., conduct going beyond mere misrepresentations, "might be deemed sophisticated." Id. (punctuation modified).

As for his offense conduct, DuMouchelle asserts that "[t]he only thing alleged to be fictious was the initial representations (or omissions) made by Mr. DuMouchelle to ultimately acquire the monies used to pay pre-existing business debts." Def. Mem. at 5. That is incorrect. According to the plea agreement, the PSR, and the Government's uncontested allegations, DuMouchelle did more than just misrepresent the nature and purpose of his transactions. For instance, to induce T.R.'s participation in the fraudulent Yellow Rose transaction, DuMouchelle sent T.R. fake emails and wire transfer instructions. Rule 11 Plea Agreement at 3; Gov't Resp. at 5. DuMouchelle also attempted to make it look like the transactions with T.R. and T.G. had actually gone through, sending a fake receipt and fake contract to T.R. and a misleading bank account screenshot to T.G. Rule 11 Plea Agreement at 4; Gov't Resp. at 5–7; PSR ¶ 21.

Courts have consistently held that the creation and use of such falsified documents warrants the sophisticated means enhancement. See, e.g., United States v. Ramdeo, 682 F. App'x 751, 760 (11th Cir. 2017) (applying enhancement in sentencing defendant for wire fraud and

6

money laundering where defendant, among other things, created a fake email for a fictitious company); United States v. Allan, 513 F.3d 712, 716 (7th Cir. 2008) (applying enhancement where defendants' conduct included doctoring fax headers and fashioning phony e-mail addresses to resemble legitimate contact information); United States v. Bin Wen, Nos. 6:17-CR-06173 EAW & 6:17-CR-06174 EAW, 2018 WL 6715828, at *15 (W.D.N.Y. Dec. 21, 2018) (applying enhancement where defendants put signatures of fictitious individuals on shell company letterhead, misappropriated individuals' names and credentials, and "created false email addresses, phone numbers, and fax numbers to perpetuate their fraud").

DuMouchelle likens his case to United States v. Brown, 877 F. Supp. 2d 736 (D. Minn. 2012), arguing that his fraudulent conduct, like the Brown defendant's, was "'easily detectable'" and, therefore, non-sophisticated. Def. Mem. at 6 (quoting Brown, 877 F. Supp. 2d at 752). In Brown, the district court declined to apply the sophisticated means enhancement, reasoning that although the defendant created an LLC and opened bank accounts to orchestrate the fraudulent scheme, he "did not create fictitious entities, corporate shells, or offshore financial accounts for . . . [fund] assets, but rather opened readily identifiable accounts at local banks." Brown, 877 F. Supp. at 752. DuMouchelle suggests that his fraud was easily detectable because "[e]very bank used Mr. DuMouchelle's individual or corporate name on the account," and "many of the victims knew [the numbers of these accounts]." Def. Mem. at 14.

The Court concludes that DuMouchelle's reliance on Brown is problematic for two reasons. As a preliminary matter, Brown, an out-of-circuit district court opinion, is at odds with precedent of the United States Court of Appeals for the Sixth Circuit, which this Court is bound to follow. Specifically, Brown supports the view that creation of an entity or account does not warrant application of the sophisticated means enhancement unless the entity or account is

7

fictitious—a view the Sixth Circuit rejects. See Benchick, 725 F. App'x at 379 (finding that a defendant's "use of companies . . . as conduits for the proceeds of his schemes justifies the application of the enhancement" and explaining that the defendant's "retort that the companies were more than mere 'shells' because he and his father had conducted legitimate business through them for years prior to the events of this case misses the point. The fact remains that the court had clear evidence that [the defendant] . . . used corporate entities in furtherance of his criminal activities."). Brown, therefore, is neither binding nor persuasive authority.

Even if Brown were persuasive, DuMouchelle's offense conduct is distinguishable because it was not "easily detectable." DuMouchelle's suggestion that his victims could have easily detected his fraud because they "knew" his bank account numbers is premised on the unreasonable assumption that his victims should have had his lengthy bank account numbers memorized such that they would recognize the numbers as belonging to DuMouchelle upon seeing the numbers. People do not typically memorize the bank account numbers of others. Thus, DuMouchelle's victims would not have been prompted to cross-check the account numbers unless they had reason to believe that DuMouchelle was lying about the ownership of the bank accounts. DuMouchelle went to great lengths to keep his victims from having any such suspicions. DuMouchelle utilized techniques beyond mere misrepresentation that made it difficult to detect his fraud, such as sending emails to T.R. containing what appeared to be (i) a forwarded email from the seller of the Yellow Rose with wire instructions to a bank account belonging to the seller, (ii) an authentic receipt from the sale of the Yellow Rose to T.R., and (iii) a real contract for the resale of the Yellow Rose from T.R. to a buyer in Bloomfield Hills. In fact, these were all fraudulent, but a customer receiving such emails and attachments would not be able to easily detect that something was awry.

In sum, DuMouchelle's offense conduct clearly rose above the "garden-variety" level of wire fraud.  See Sethi, 702 F.3d at 1079.  The Court, therefore, will increase his offense level by two levels.  See U.S.S.G. § 2B1.1(b)(10)(C).

### III.  CONCLUSION

For the foregoing reasons, the Court will apply the sophisticated means enhancement in calculating DuMouchelle's sentence.

SO ORDERED.

Dated:  July 27, 2022                                   s/Mark A. Goldsmith
           Detroit, Michigan                            MARK A. GOLDSMITH
                                                        United States District Judge